18-1454 Grangeville v. RIT Management v. Frickville, CSL Morning, Your Honors. I'm Dennis Lynch on behalf of the Plano Public Highland. Robert Greenhill. Good morning. Brian Aldridge on behalf of REIT Management & Research and CW601 Chicago. Stephen Rouse on behalf of Kissing Crop Elevator Corporation. Good morning, Your Honors. I'm Anthony Richrovot on behalf of the Third Party Defendant's Superior Encampment. We're going to take our guards up 10 and 10, and I have my separate claim against the Third Party Defendant. I'm going to rest on my briefs as my initial, allow him to respond when I was a minute or two to reply, and rebut rather. I've been looking for five minutes. Yes, sir. It's fine. Very good. Thank you, Your Honor. And then, Your Honor, I'd just like to reserve a few minutes for rebuttal as well. We have police in court. Counsel, again, my name is Dennis Lynch. I represent the plaintiff appellant, Robert Greenhill, who was injured on September 25th of 2012 on Freight Elevator Number 3 at the 600 West Chicago Building, and whose injury would have been avoided if the defendants did not needlessly take seven months to install an infrared detection edge on Freight Elevator Number 3. Mr. Lynch, are you basing that statement? Is the purpose of that statement to establish that they had noticed that there was a defective condition in the elevator? I think for a number of reasons. Notice would be one of them. They executed a service and repair order to install this infrared edge, and they'd installed it on other freight elevators. So they were certainly aware that it was, if you want to characterize it as defective or otherwise characterize it as not reasonably safe, they knew that this elevator needed to have this infrared edge installed. So how do we determine the defendant's duty of care here? I think it's already been determined for you by the Jardine case by the Supreme Court. I mean, the building owner, the elevator operator, has the highest duty of care to its passengers, and the elevator company owes a duty of reasonable care. And I think, you know, the Marshall v. Burger King case makes very clear, you know, the burden is not to establish a duty to repair or a duty to upgrade or a duty to train. It's just a duty of reasonable care. I think that's really already established in this circumstance by the Jardine case. I mean, especially as it relates to Reed, to the building. Let's assume, you know, let's assume we find duty here. But did this accident result when somebody pressed a button and then the elevator door closed? That's certainly what started the closing process in this case was an individual pressed a closed-door button. So tell me, how could the defendants have prevented this accident from happening? Well, an infrared detection edge would have prevented the accident. I mean, that's the very purpose of the edge is to avoid the door from continuing to close if an individual is in the threshold. That's the purpose of the device as spelled out in their own documents. In fact, the chief engineer for the building the next day in an e-mail said we had an accident that might have been avoided if we'd had that infrared detection edge installed. Pressing the door closed button does not override that infrared whatsoever. The infrared will control. So the mere fact that a door closed button was pressed is just why the closing sequence starts. And the issue when you come to any sort of intervening or superseding cause is whether it's foreseeable. And we've all been on elevators where someone inadvertently pressed a button. I mean, certainly it's a foreseeable thing that can happen. So are you arguing that the infrared mechanism is a malfunction? I don't think it's a malfunction, Your Honor, but I think under the facts of this case, the reasonable care and the highest degree of care as to require them to have that infrared edge installed. Were there any other accidents that occurred on this elevator? So the original accident that happened about seven months earlier on February 17th, some of the documents refer to it as occurring on freight elevator number three. Some of the witnesses have testified it actually occurred on freight elevator number six, and an infrared edge was immediately installed on elevator six at that time and proposed for freight elevator three. And then on August 17th, another individual hit their head on the inner gate of freight elevator number three, the same freight elevator, and it was a few days after that that Reed actually finally executed the work order to have this infrared edge delivered. There was also some very general testimony from Mr. Toomey from Superior Mechanical that this type of accident had happened in the past. But certainly this, you know, our timeline starts with another accident on another freight elevator in this same building. And Reed's own elevator consultant, Tom Haney, his testimony was that if you have freight elevators in a building, they're all performing similar tasks, they should all have similar safety devices. And I think that's a pretty easy statement. And did all of the other freight elevators have this infrared technology? That's correct. All of them except three? Correct. All the paperwork, the contemporaneous paperwork all says this is the last elevator to have this device installed. You know, I think this is really an easier case than most. You know, in the average torque case, you have some expert that comes in and says, you know, I've worked at these 10 other companies and this is how, you know, they did it, and I think that's what the defendant in this case should have done. Here it's a very unique situation where these two defendants are the ones who decided this infrared edge should be installed on this very freight elevator, and yet they waited seven months to do it until more accidents occurred, until Mr. Greenhill's accident occurred. And then they come up with this story that, oh, the part was on back order, which we know is untrue. The part was available for at least a month, even when this paperwork was executed and would have been available much earlier if the proposals had followed through in some sort of reasonable time. You know, the defense contends that this is open and obvious. What do you have to say about that? Your Honor, I don't think this is an open and obvious case in any sense. For one thing, just the sheer amount of time involved, there was one second between when the door close button was pressed and the door started to close and Mr. Greenhill was struck. He had no idea the door was closing. He had no idea that it would close. You know, this isn't a recognized open and obvious hazard like fire, like water, those sorts of situations. So I don't think that doctrine applies at all. And even if it was somehow implicated. I mean, there's really nothing that's open and obvious here, is there? No. It's just that there's gates. Correct. I mean, elevators do close. I mean, that's certainly a fact, but he had no reason to believe that this one would. Isn't that question of whether it's open and obvious, isn't that a question of fact? At a minimum, I would think it's a question of fact, yes. I mean, I think that there's certainly, defendants have arguments that they can use to try and persuade a jury. But the question here is whether summary judgment was appropriate, and it was not. There are questions of fact, and open and obvious is one of them. And, Justice Gordon, your opinion in the Duffy case versus Togar, along with many others, have held that open and obvious would not be a per se bar in any event. But when you have one second, there's no opportunity for someone to avoid an accident. He had no idea it was happening. The only authority that defendants cite is that Murphy v. Ambassador East case, where the plaintiff himself was trying to close the door. So he certainly knew there was a possibility that this door would close, and that's what he was trying to do. Mr. Greenhill was not trying to close the door, had no idea that the door was going to close. They had inadvertently gotten off on the wrong floor. So there's really no, I don't think that doctrine has any applicability, and I know there's been some analysis as to whether that applies to a possessor of land who's not a landowner or not. I don't think the court even needs to reach that issue because it's just a doctrine that doesn't apply to this case, and if it did, it would certainly be a question of fact. You may want to at some time keep some of your time more for rebuttal than anything since you have so many defendants. So if you choose to do that, we'll accept that. Just very briefly, Your Honor, there is also, I haven't touched on it. But certainly talked about in the brief, there is competent expert testimony on plaintiff's behalf, establishing the necessary elements of the case for an experienced elevator operator who testified both to municipal code violations and to custom and practice in the industry that the infrared detection was necessary and also that the way the elevator was used, an audible alarm and a flashing light would have been necessary. So for all these reasons, I would submit that summary judgment was inappropriate, that this case is replete with fact questions, and I will save the remaining of my time for rebuttal. Thank you. Defense. Once again, Brian Eldridge on behalf of Lead Management and Research in CW600 West Chicago. May it please the Court and Counsel, I want to begin with two salient facts I think that are important. Number one is the elevator did not malfunction. The elevator operated exactly as it was designed and as exactly as it's supposed to operate. Someone pressed the button and the gate descended. That's how it's supposed to operate. This is not a case of malfunction. You had the infrared lights. Wouldn't that have been something that could have prevented this accident? I don't think it could have, and we addressed that in our brief. I think Mr. Johnson, the plaintiff's expert, gave the blanket opinion that it would have prevented it. But if you look at Mr. Johnson's methodology, all he did was look at a video, a video we provided to the court, and he said he believes that the plaintiff's left leg would have gone inside the cab such that it would have activated the infrared signal based upon the video only. Well, let's assume that what you say is true. Okay. Doesn't that create a question of fact? I don't think so because an expert's opinion that is based on a dubious methodology, that has dubious validity, which is what we have here, is not an expert opinion. It's not admissible for that purpose. But that's the basis of a cross-examination, counsel. It's not a basis to make a ruling as a matter of law. Your Honor, I believe that in order for there to be competent evidence before the court, there needs to be a legitimate opinion that complies with Fry and the methodology propounded by the Supreme Court. But needless to say, I don't think we have to get to that point because this is an issue of duty. And the second point I wanted to make is we are not denying the existence of duty. I want to be very, very clear about that. Mr. Lynch is correct that there is a duty. There's a duty of reasonable care with respect to our premises as the building owner. There's also a heightened duty, the highest duty, with respect to the conveyances within the building. Okay? But even being a common carrier does not make someone an absolute insurer of safety. Yes, but here you ordered something to be placed on the elevator for safety. We ordered an upgrade. Okay. It's a better device than the existing. But the question is, it's a safety. It's a safety event. It's something to prevent accidents you felt that you needed. Okay? And if you felt that you needed it, okay, and that then a trier of fact could find that you should have decided not to use the elevator until it was installed. Well, this I would say, ThyssenKrupp is the elevator expert that we hired. They're in the building. They're there 15 to 20 hours a week. And they're incumbent. They're required to tell us if there's any safety-related issues. And they have the opportunity to take elevators out of service if there are safety-related issues. And they did it. And the reason they did it is because the elevator as it existed was not unsafe. Whether you call it an upgrade, an add-on, new technology, whatever it is, I would agree with the court that it is probably safer than the existing technology on the elevator. But we see that all over the place. There's, I mean, cabs. No, no, I understand your argument. That's not a problem. The problem is that what you're telling us is that there's an issue of fact here. There's an issue of fact to be decided by the trier of fact. I'm suggesting that there's not a duty. Just because there's a duty of care and there's a heightened duty. And the fact is, did you violate the duty of reasonable care? I mean, that's normally what happens in a negligence action. So respectfully, I agree and I disagree. The point where I disagree is that, for example, a manufacturer has a duty of care. A manufacturer has to make a safe product. A manufacturer has a duty to warrant. But a manufacturer does not have a post-sale duty to warrant. That is law that's been crafted. And the reason for that is the ramifications in doing so. Let's take a premises owner. A premises owner has a duty to maintain their premises in a reasonably safe condition. A premises owner does not have a duty to repair de minimis deviations in the pavement. That's a law based upon the ramifications. And here the ramifications of imposing upon a building owner a duty, as soon as they receive a proposal, to accept it, pay for it, and implement it are significant. And first of all, could you imagine what would happen? We would be flooded with vendor proposals, new technology, every time something came out, requiring, ostensibly requiring businesses to act. Now, it may be ideal, but it's really idealistic. It's not practical. We'll step back for a moment, though. But given the fact that these mechanisms were already starting to be placed, and then this was the last elevator where one of them was going to be placed into the elevator to make it a little bit safer, doesn't that create a question of fact? I mean, if there isn't an issue with the elevators, then why are you placing these mechanisms? Granted, you have the highest duty of care. RIT has the highest duty of care because it's a common carrier. Therefore, they're trying to exercise that by putting these mechanisms in. This one doesn't have it. So, therefore, don't you have a question of fact here? I still think it comes back to duty. And I agree with the Court. There was one that was installed after RIT took over owning the building in 2011. They installed one on a separate elevator. And I do want to address the two accidents that Your Honor brought up. But that doesn't necessarily mean they have to install all simultaneously. There's a lot of reasons that property managers, building owners might not do that. Maybe they can't. There's prioritizations. There's budgets. There's capital expenditures. But aren't you answering my question, though? There is a lot of questions. There's a lot of questions of fact as a result of it. I just think that if you're entering a duty, you're acknowledging a duty on behalf of property owners to accept proposals, that has major ramifications. And if you look at the four factors here, that triggers, too. It's a massive expense. Where does it end? Does RIT, if they own a property in 600 West Chicago, and they install new technology in one of their freight elevators, which may be utilized differently than this one, do they then have to put it in every elevator in the building? But those are all questions you can bring up in cross-examination. Those are all questions that are vetted at a trial. The whole point here is you're asking us to jump over all that. I think it's a question of duty. And the reason I think it's a question of duty is because it's not unlimited. It's not enough to just come in and say, everyone has a duty of reasonable care to all people under all circumstances. That's not the law. I pointed out two exceptions from the get-go. The de minimis exception, the post-sale duty to warrant. And it's all because of policy. Duty as an initial matter is framed by policy. It turns on policy. That's Supreme Court law that says that. And so when you're looking at the four factors, yes, we have a duty of ordinary care with respect to our premises, and the highest duty with respect to our conveyances. There are hundreds of cases that say that duty is based on notice and knowledge. I'd like to talk about notice. Because we had no notice. No one had any notice. The reason that we had no notice is because the elevator was safe. It was never taken out of service. It was never suggested to us that we should take it out of service. Even after the proposal was issued, no one came to us and said until you have an opportunity to install and pay for this proposal, you should take this elevator out of service and make sure no one uses it because the elevator was safe. And no one says differently. And if the elevator was so safe, then why would you need these infrared lights? You don't need them. The code doesn't require them. They're not necessary. But your company believed they were needed. Our company added on to technology. Well, I say, but that's a question of fact again. That's a question for the trier of fact to determine whether your company was doing this because they were doing it for public safety or whether they were doing it as an upgrade. Isn't that a question of fact? No, it's a question of duty. It's because it goes back to those four factors. I really don't believe that it's a question for a trier of fact to determine why things were being done. The issue is are you going to impose an obligation on property owners to accept every proposal that comes their way in an instant? And that's the problem. It actually creates a massive burden. Does it stop in the property or the state or the country? And REIT has properties all over the place. If they upgrade the technology in any elevator. On one hand and on the other hand, you have the question of notice and knowledge. Right, and back to the question of notice. And then the question is did you do it because you had notice and knowledge that the elevator needed this for public safety? I have a question about that. Yes. Is every elevator an open, obvious danger? Well, according to the Murphy case, it's not the fact that it's an elevator. The fact that there are doors that open and close is open and obvious. That's the Murphy case. That's what it says. So what makes this elevator an open and obvious danger? That there are doors that open and close, and that should be evident to you. I thought it was a gate. It was a gate. I thought it was a gate coming from the top. So it's really not the same as an everyday elevator case. It's not. Murphy wasn't an everyday elevator either. Murphy, in my recollection, was the same. It was a vertically closing, bi-party doors just like this. But this did have a gate. And Mr. Greenhill knew that there was a gate. Remember, Mr. Greenhill entered and exited the elevator three times within the course of the two minutes prior to the incident. So Murphy, under Murphy, and that hasn't been distinguished by this court or another, says that the fact that doors open and close is open and obvious. But notice, I think, is a critical issue because no one can point to adequate, legitimate notice on the part of either my clients or ThyssenKrupp that there was anything wrong with the elevator because there wasn't. There was nothing unsafe about the elevator. The suggestion is that we needed to immediately upgrade the elevator in order to make it safer. It would be like Yellow Cab saying or someone arguing to Yellow Cab that they need to immediately put in automatic braking systems into their vehicles. Well, they can't do that. There would be anger. What I think is open and obvious is a person sees a danger, okay, and a reasonable person would not go forward. That's what open and obvious really means. I certainly appreciate that. Not these other things that are brought out in your briefs. I've looked at every open and obvious case of the United States. I have them all on one big file. And that's what open and obvious means. It doesn't mean these other things. I certainly appreciate that viewpoint, Your Honor. I'm working off of Murphy and based upon what Murphy says, it's the doors that close. I wanted to address one thing, which is, I don't know how much time I have left, but we did receive a proposal and we authorized the improvement, they authorized the installation of this within 30 days before the accident. And according to the plaintiff's own expert, that was sufficient time for it to be installed. And it was received 28 days before the accident. In other words, discharged any duty that it had by doing exactly what the plaintiff says it didn't do, which is authorize the installation of the door edge. I believe that they discharged their – the plaintiff claims they should have discharged their duty by authorizing the – that's all we could do. We can't install it. We did authorize it. We authorized it indisputably in sufficient time for it to be installed. That's based upon plaintiff's own expert. That's not me saying that. All right. Before we close the door on this, no pun intended, but here we have a situation, you're talking about open and obvious, but you have an intervening act. We do. Causes the problem here. So how is that open and obvious? When you have someone pushing a button, I mean, are you supposed to expect that someone's going to push a button and the door's going to come down on your head? I think that according to Murphy and how I read it at least, how Judge Walker read it at least, was that the fact that doors come up and down is open and obvious. So a person familiar with that process, which Mr. Greenhill was, as would anyone else be familiar with that process, would appreciate that and protect himself against that issue. Wasn't Murphy after a trial? I don't remember. I'm vaguely thinking that it was after a trial and not on a summary judgment. That's good. I don't remember. I apologize.  I don't remember either. Thank you, Your Honors. Okay. Good morning, Your Honors. Good morning. And please, the Court of Counsel, again, my name is Stephen Rouse. I represent District Elevator Corporation. I certainly have been paying attention to the Court's comments, and I would like to address some of the issues that have been raised. And rather than go with any prepared remarks, I'd obviously like to respond to any questions. I'd like to deal with the other previous questions, because I believe my client provides a perspective that has not been addressed previously. Let's talk about notice. I know that, Judge, you have a serious issue with the notice here. Given this fact pattern, given what happened, a lot of discussion has been notice on one elevator provides notice to a building and asks for a problem on another elevator. That is not the law in the state of Illinois. The Dadland case, which we cite, the case that plaintiff jumps up and down on, that Jardine v. Ruboff case, says notice of a different problem on the same elevator doesn't give you notice of a different problem on that same elevator. That's an Illinois Supreme Court case. There's a householder case. There's legions of cases that say exactly the same thing. So now we have a different elevator that has a different problem. It has to be substantially similar. That's plaintiff's burden. Zero evidence on substantially similar in this case. A lot of tough discussion right here in front of you off the record, but not in the case and not in the briefs, not given to the judge. So how can an accident, a non-substantially similar accident on a different elevator, provide notice to an elevator maintenance company or owner of a problem on a different elevator that has been there for decades in substantially the same condition? Wasn't there an injury on this elevator, on elevator number three? Not substantially similar. We're not sure, but yes. There's video of that accident, Judge. No, no, no. Not our plaintiff in this case, but didn't they order the infrared technology when there was an injury on this elevator? No, ma'am. I'm a judge, but you can call me judge. I'm sorry. I apologize. No, Judge. It was a case that I handled, elevator six. It was a woman that tripped over a gate, or excuse me, the door. And I did not know what came to closing of the gate at all. So that accident is not substantially similar to this case. That accident is on video. So let's assume that everything you say we take as true. We still have the fact that the management company and owner here ordered this infrared system. Your company did not install it. And the question is, could that be negligence? Isn't that a question of fact? No, sir. Why not? Because the plaintiff is trying to graft onto the 3156, 3166, excuse me, in the record. It's called the District of Service and Repair Order. The plaintiff is trying to graft onto there a completion term, which is not contained in this agreement. You can't say reasonable time. You can't add a term into this agreement. Forget about the agreement. The question is that there was an order to put in an infrared, and it wasn't put in. So wouldn't a trier of fact determine whether that act of not putting it in within a reasonable time was negligence? Sir, it was put in. It just wasn't put in before the accident. And since there's no time provision here, Judge, Well, that's for the trier of fact to determine. I'm not sure that there's anything to determine. That's not a question of law automatically. I think it's a question of contract, sir. I believe it's Contract? This is not a contract case. Well, it's a negligence case. Our duty is defined by the contract. We've cited cases for that provision, both in the maintenance contract itself and the service and repair order. And if I don't have the time to put it in by, how can I breach it? There's plenty of reasons why there was a delay. There could have been budgetary reasons for six months. We could not have been staffed properly. It turns out we did have the equipment. Well, I understand everything you're saying, and it may be a perfect defense to this case, but it would be something that the trier of fact would make a determination on, not as a matter of law for a judge to do that. If your claimant has doubled down on the theory that liability attaches here because we failed to timely provide this upgrade, there is no time specified in 3166 for that upgrade. So I did not breach that timely requirement. We installed it when we could, given the circumstances. To say that we didn't do it in time only is in relationship to the accident, not in relationship to the operation of the business or the institution. Well, why are these mechanisms being put in place in the first place? I'm glad you asked that question. This, as I said to prior questions, this light curtain is not installed to prevent this accident. It wasn't even installed to prevent the accident on the other elevator where the woman tripped over the gate. Why do I say that? Because the curtain is on the inside of the cab as it travels with the elevator. The claimant in this case was in the hallway when he was struck. He was outside of the cab. So you have to pass through the gate that's going to hit you on the head in this case and the doors that are coming up from the top and the bottom before you get to the light curtain. So how could this light curtain have prevented this accident? It doesn't make any sense. It certainly couldn't have prevented the accident on 6 where she tripped on a door that came up spontaneously. The only bottom door came up spontaneously. If you were malfunctioned by another elevator company, then my client would have been catching up. It certainly wouldn't have caught the other accident where a woman is trying to duck under an elevator, basically beat it coming down, and she hits either the side of her head or her shoulder. I'm not sure. What about the individual that's already inside the elevator who's going to go push the button? Wouldn't the frame or the infrared have caught that individual from moving forward? No, it would not have because Mr. Flames is inside outside of the light curtain, so he's not going to activate the light curtain. Mr. Greenhill is outside the hallway walking in, never gets to the light curtain, and it's important to know that the safety edge is still on this elevator. It's not like the safety edge is gone now and there's this new wonderful product. If the light curtain was designed or was intended to prevent this accident, it would have been out in the hallway because it would have been activated before he could have got to the gate that comes down before the doors close. The gate's a safety device. The gate says, look, you can't go any further. This elevator's about to move. It provides you notice of movement. So if the plaintiff can't walk in, have those gates closed on him in a time show way as he's walking in, that would be very dangerous. So to say that this light curtain is somehow going to, A, stop this accident or is in response to this accident on an elevator that never had this problem ever.  So for someone to say we had to take it out of service, take out an elevator that's operating properly out of service, you know how burdensome that would be? Or to make a proposal and say you can't use this elevator, Mr. Building Owner, until you accept this upgrade. There's plenty of buildings in Chicago that only have one elevator. People would be without an elevator for weeks, maybe months. And we don't want to do that to anybody. And the court doesn't want to place that burden. Wasn't this number three of six on freight elevators? Judge, I'm sure you know this building, Judge. This is an enormous building. You're right. But this whole parade of horribles that nobody's going to be able to use an elevator and everybody's going to have to take the stairs, that doesn't exist here. Yes, ma'am. Judge, it does. That's a bad habit you have. I apologize. Judge, it's the only elevator that serves the basement. That's why these people are on this elevator. That's the sole reason these people are on this elevator. Elevators have different functions. This was an elevator designed for moving heavy equipment. It's a sign on there that says, employees only, heavy equipment removed. Before heavy equipment. It's in the record. So this is the sole elevator that serves this function. High capacity, goes to the basement. All these people are going to the basement. They couldn't get there any other way. And they can only use the freight elevator. So to say that all freight elevators are the same, Judge, I disagree with. And facts in this case don't support that. Because this elevator was the only elevator these construction employees could use for storage of materials because they're storing materials in the basement. That's why this accident occurred. That's why these gentlemen were on this elevator. They got off on the wrong floor. That's the only reason they were on this elevator. And we're going to take this elevator out of service for months during a construction project  The court has to understand. It's disincentivizing these repairs. It's saying, hey, I'm not going to make these proposals. I'm going to be liable for every accident in the building. For a non-similar accident. For the reason I suggested the proposal in the first place. It's gutting post-accident repairs. That whole rule, you're gutting that. Because that's admissible now. You're saying, hey, if we did this in this case, which is arguably a post-accident repair to another accident, we're going to use that against you in a different case. As proof of your negligence. I don't believe you can do that. I shouldn't do that, I should say. You can do whatever you want. But I think that's wrong. I think the post-accident repair rule is there for a reason. And the lack of duty here is for the same reason. Because you don't want to have that slippery slope. And there is a slippery slope here. And I think you need to appreciate it. From the perspective of a manufacturer maintenance company. Any other questions? Thank you. Rebuttal? That's right, you won five minutes. I forgot. That's right, you won five minutes. Good morning, Your Honors. May it please the Court. Anthony Richrovato on behalf of Superior Mechanical. Superior Mechanical was the employer of Mr. Greenhill. Superior Mechanical is a sprinkler subcontractor that contracted with Power, the general contractor, to perform the sprinkler installations on the fifth floor. I just want to talk about two or three quick points. The first point I want to raise is on proximate cause and Rule 341H7. And basically, ThyssenKrupp, in their initial brief, raises one issue concerning Superior Mechanical. And the issue is whether or not the lower court erred in finding that we owe no duty. They raised no issues concerning proximate cause. And in the report of proceedings, page 148, the trial court granted summary judgment on both proximate cause and duty. In the Court's own words, there is no act or omission of SMS proximately causing or contributing to plaintiff's injury. So the lower court granted summary judgment on proximate cause and damages. ThyssenKrupp never argues that the lower court erred on the issue of proximate cause anywhere in their brief at all. And under the modified Rule of 341H7, modified just last year, points and issues not argued in an appellant's initial brief, the rule now is forfeited instead of waived. So they waive any argument against Superior Mechanical on the issue of proximate cause. As a result, we're asking this court to affirm the trial court's judgment on the issue of proximate cause, period. I have a question. Yes, sir. The individuals that were there on the day of the incident, were they all your employees? No, absolutely not. Okay. No. Like the person, I think Mr. Plank or Mr. Plant, who pressed the elevator button, worked for a totally different trade. I don't know what trade it was. It's in the record. Yeah. But there were other trades there. And not only trade workers from the sprinkler fitter were on the elevator at the time of the incident. So the issue of proximate cause is forfeited. And if we want to go beyond that, if we want to go to the merits of the proximate cause argument, their only duty argument concerning Superior Mechanical is under ANSI A17.1, and they argue that we were supposed to train our people, including Mr. Greenhill, in the operation of a freight elevator. And that's the only duty that they argue against Superior. Now, if we go to the merits, there's still no proximate cause because, number one, Mr. Greenhill himself, in the record on C2294, testifies that he already owns the house. Let me ask you this question. Is there any evidence that Superior failed to properly train, instruct, or supervise its employees? No. There's no evidence in the record. Okay. So if there's no evidence of that, then you can't be responsible, can you? Well, I would agree with that wholeheartedly, Your Honor. All right. I would agree with that. So it's not really a question of proximate cause or anything else. It's a question if there's no evidence of that, then you can't be found liable. Okay. Well, I just like things. In lieu of the forfeiture, I always like to talk about the merits. Forfeiture is something between departments. The courts do not have to accept it. Absolutely. That's why I like to talk about the merits. You could talk about forfeiture all day, but, you know, that's what forfeiture is. I have a question with regards to open and obvious. You know, they're alleging there was an open and obvious danger. So do you have a duty or responsibility to train your employees to make sure that now, when they walk towards an elevator, that they're dealing with an open and obvious danger? There's no case law suggesting that we have such a duty. That would mean that everyone that uses an elevator needs to be trained in just entering on the contrivance and being brought up and down the building. And that would be, obviously, a duty that would be overly burdensome for any employer. But there's no case law on that? There's no case law on that saying that an employer owes a duty to its employees to train them on how to enter an elevator or a freight elevator. So, and then… Is that actually responsible for the acts of your employees? If we would be talking about vicarious liability, if one of my employees did something that caused injury to a third party, then, yes, under a vicarious liability theory, superior mechanical would be liable in tort. But that's not the scenario we have here. We have a duty to provide our employees with a reasonably safe place to work, but we're not an insurer of their safety. And their main argument, again, going to their main argument, which they only raised before this court, but they never raised it in the lower court. In their brief, they argue that superior owed a duty pursuant to ANSI A17.1 in their short argument against superior before this court. But if you look at the record, so that would be under a contract. They're alleging an ANSI duty under a contract. But their third party complaint does not make any allegations that we owe a duty pursuant to contract. Their third party complaint does not make any allegations that we owe any duty under ANSI A17.1. And their response to our summary judgment motion does not raise that point before the trial judge either. So it's inherently unfair for all of us in this room today to look back on an issue and say that the lower court erred on this issue when the appellant never even raised the issue before the lower court. So that issue was not raised before the lower court. And then just talking about duty again on the merits. So they had an expert. Tyson Krupp had an expert, Mr. Donnelly. And they cite to their expert's affidavit. And this is in their argument against superior. They cite to their expert's affidavit in support of their argument that superior owed a duty to Mr. Greenhill under ANSI 17.1. And it's paragraph 24, and it's in the record at 1507. And they cite the paragraph 24, and it continues in paragraph 25. But those paragraphs don't Mr. Donnelly doesn't say that we owe a duty to train our people in the operation of an elevator. These paragraphs, in these paragraphs, Mr. Donnelly, Tyson Krupp's own expert, says that power had a duty to train someone to operate the elevator. So their only citation to the record in support of their argument against superior, their only citation to the record in support of that argument doesn't even support their argument. The only citation to the record that they give supports an argument against power and not against superior. Nowhere in their own expert's affidavit does he say that we had a duty to do that. And actually, my very last point on duty is that they argue that we, as a union sprinkler pipe fitter, okay, subcontractor, that we had a duty to train our people to operate a freight elevator. Now, this makes no sense at all in light of the fact that, according to the record, Brian Fiorito testifies, and it's unrefuted, I should say. I'm just trying to hurry up because I know we've got a lot of people arguing here. Brian Fiorito testified in C-2344 that freight elevator operators are union members under the Heavy Equipment Operators Union Local 150. So we should not be training pipe fitters or sprinkler fitters to do another union member's job. And actually, what they're arguing is contrary to the contract. The contract, which appears in the record at C-926, has a provision about project harmony under Article 21, and that is that subcontractors are not supposed to have their people do things that conflict with other union subcontractors. So what Tyson Krupp is arguing is that we as a sprinkler fitter should train our people to operate a freight elevator, which is now invading in another union's operation. So the argument or the affidavit from Mr. Donnelly supports a strong – the responsibility to provide an operator makes a lot of sense. They're the general contractor. They're the ones that spread out and allocate who's doing what on the job. They should have had, if an operator is necessary, they should have had someone from the Heavy Equipment Operators Union Local 150 operating that freight elevator, not a sprinkler fitter. So Superior Mechanical respectfully asks this Court, and Your Honors, to affirm the lower court's summary judgment in favor of Superior and against Tyson Krupp on the third-party complaint. So do Your Honors have any questions? Thank you very much. Okay. Hello? Mike Lennon. Well, you know, I don't know that you get another chance. How do you get another chance? Show me how. I mean, tell me how. I mean, it's something new to me, and I've been around for a lot of years. Go ahead. Briefly, Your Honors, in terms of the testimony of my expert, Mr. Johnson, about the accident being prevented, he measured the infrared edge that was on the van. Well, how about Superior? What about them? Do you have a way to keep them in this case? Your Honor, it's not directly my fight, but I do believe that an employer always has the overriding duty of care for all of its employees. There was obviously misunderstandings as to the functionality of this elevator by both people from Superior Mechanical and other contractors on the job site. So I think, again, it comes down to fact questions, and I think the best. Well, I just wonder, where is there any evidence against Superior? Where do you find it? So, Your Honor, I don't have a claim against Superior as my employer. I had to try the workers' comp case, but I don't have, I believe, in my opinion, I believe they have an overarching duty, and it's best to have a jury resolve those questions, but I'd be unable to provide more specifics. You know, there's been a lot of emphasis was placed on the fact that, you know, this infrared edge wouldn't have prevented this accident, and it wouldn't have prevented the ones on six or the other ones on three either. Well, they sure installed it real quickly after the accident on six, and they sure installed it real quickly after this accident. And we know from the building engineer that he believed it might have avoided the accident. So I think there's sufficient evidence there. There's also been a lot of talk about good reasons to not install this edge just yet. Well, if there was a good reason for it, they wouldn't have lied about it being on back order. They would have provided a good reason, and that hasn't happened. But most importantly, all those are fact questions. What about the fact that they raised that the infrared would have not stopped the door from coming down because it was on the outside coming in, and they still have the gate? Well, it's not – the testimony from Vice Mr. Johnson is that the infrared was three-quarters of an inch inside the cab, and that Mr. Greenhill was three-quarters of an inch inside the cab, or it would have triggered at the time. And I think a fair viewing of the video confirms that. I think as to REIT, there's a binding admission from their chief engineer that it would have prevented it. And I think that's also competent evidence against the other defendants. And as well, I mean, we've talked mostly about the infrared edge, but there was also testimony that there should have been an audible alarm and a visual strobe. It's unconverted – it's uncontradicted there was no visual strobe, which also would have alerted Mr. Greenhill to the accident. I also think it's important to mention both Mr. Greenhill and Mr. Plain believe there would have been infrared detection available. And then finally, as to the argument that, you know, this is the only elevator that goes to the basements, how do you take it out of order? Again, I think that just reinforces that you have to get this part installed quickly, and if not, that's what triggers a duty to warn. When you have other elevators that are safe and one elevator that isn't safe, but for some reason people need to use it, that's where a duty to warn comes in. Unless there's any other questions, I'd ask your honors to reverse the decision of the circuit court in all respect. Thank you. Well, I think you guys gave us a very interesting case. I think the briefs were very well done. I mean, I never saw a stack like that in my life. And I think the lawyers did a terrific job on oral argument, and shortly we'll have an order or an opinion for you. So the court is adjourned. Thank you.